3 U.S. 386 (____)
3 Dall. 386
CALDER et WIFE,
versus
BULL et WIFE.
Supreme Court of United States.

CHASE, Justice.
The decision of one question determines (in my opinion) the present dispute. I shall, therefore, state from the record no more of the case, than I think necessary for the consideration of that question only.
The Legislature of Connecticut, on the 2d Thursday of May 1795, passed a resolution or law, which, for the reasons assigned, set aside a decree of the court of Probate for Harford, on the 21st of March 1793, which decree disapproved of the will of Normand Morrison (the grandson) made the 21st of August 1779, and refused to record the said will; and granted a new hearing by the said Court of Probate, with liberty of appeal therefrom, in six months. A new hearing was had, in virtue of this resolution, or law, before the said Court of Probate, who, on the 27th of July 1795, approved the said will, and ordered it to be recorded. At August 1795, appeal was then had to the superior court at Harford, who at February term 1796, affirmed the decree of the Court of Probate. Appeal was had to the Supreme Court of errors of Connecticut, who, in June 1796, adjudged, that there were no errors. More than 18 months elapsed from the decree of the Court of Probate (on the 1st of March 1793) and thereby Caleb Bull and wife were barred of all right *387 of appeal, by a statute of Connecticut. There was no law of that State whereby a new hearing, or trial, before the said Court of Probate might be obtained. Calder and wife claim the premises in question, in right of his wife, as heiress of N. Morrison, physician; Bull and wife claim under the will of N. Morrison, the grandson.
The Council for the Plaintiffs in error, contend, that the said resolution or law of the Legislature of Connecticut, granting a new bearing, in the above case, is an ex post facto law, prohibited by the Constitution of the United States; that any law of the Federal government, or of any of the State governments, contrary to the Constitution of the United States, is void; and that this court possesses the power to declare such law void.
It appears to me a self-evident proposition, that the several State Legislatures retain all the powers of legislation, delegated to them by the State Constitutions; which are not EXPRESSLY taken away by the Constitution of the United States. The establishing courts of justice, the appointment of Judges, and the making regulations for the administration of justice, within each State, according to its laws, on all subjects not entrusted to the Federal Government, appears to me to be the peculiar and exclusive province, and duty of the State Legislatures: All the powers delegated by the people of the United States to the Federal Government are defined, and NO CONSTRUCTIVE powers can be exercised by it, and all the powers that remain in the State Governments are indefinite; except only in the Constitution of Massachusetts.
The effect of the resolution or law of Connecticut, above stated, is to revise a decision of one of its Inferior Courts, called the Court of Probate for Harford, and to direct a new hearing of the case by the same Court of Probate, that passed the decree against the will of Normand Morrison. By the existing law of Connecticut a right to recover certain property had vested in Calder and wife (the appellants) in consequence of a decision of a court of justice, but, in virtue of a subsequent resolution or law, and the new bearing thereof, and the decision in consequence, this right to recover certain property was divested, and the right to the property declared to be in Bull and wife, the appellees. The sole enquiry is, whether this resolution or law of Connecticut, having such operation, is an ex post facto law, within the prohibition of the Federal Constitution?
Whether the Legislature of any of the States can revise and correct by law, a decision of any of its Courts of Justice, although not prohibited by the Constitution of the State, is a question of very great importance, and not necessary NOW to be determined; because the resolution or law in question does not go so far. I cannot subscribe to the amnipotence of a State *388 Legislature, or that it is absolute and without controul; although its authority should not be expressly restrained by the Constitution, or fundamental law, of the State. The people of the United States erected their Constitutions, or forms of government, to establish justice, to promote the general welfare, to secure the blessings of liberty; and to protect their persons and property from violence. The purposes for which men enter into society will determine the nature and terms of the social compact; and as they are the foundation of the legislative power, they will decide what are the proper objects of it: The nature, and ends of legislative power will limit the exercise of it. This fundamental principle flows from the very nature of our free Republican governments, that no man should be compelled to do what the laws do not require; nor to refrain from acts which the laws permit. There are acts which the Federal, or State, Legislature cannot do, without exceeding their authority. There are certain vital principles in our free Republican governments, which will determine and over-rule an apparent and flagrant abuse of legislative power; as to authorize manifest injustice by positive law; or to take away that security for personal liberty, or private property, for the protection whereof the government was established. An ACT of the Legislature (for I cannot call it a law) contrary to the great first principles of the social compact, cannot be considered a rightful exercise of legislative authority. The obligation of a law in governments established on express compact, and on republican principles, must be determined by the nature of the power, on which it is founded. A few instances will suffice to explain what I mean. A law that punished a citizen for an innocent action, or, in other words, for an act, which, when done, was in violation of no existing law; a law that destroys, or impairs, the lawful private contracts of citizens; a law that makes a man a Judge in his own cause; or a law that takes property from A. and gives it to B: It is against all reason and justice, for a people to entrust a Legislature with SUCH powers; and, therefore, it cannot be presumed that they have done it. The genius, the nature, and the spirit, of our State Governments, amount to a prohibition of such acts of legislation; and the general principles of law and reason forbid them. The Legislature may enjoin, permit, forbid, and punish; they may declare new crimes; and establish rules of conduct for all its citizens in future cases; they may command what is right, and prohibit what is wrong; but they cannot change innocence into guilt; or punish innocence as a crime; or violate the right of an antecedent lawful private contract; or the right of private property. To maintain that our Federal, or State, Legislature possesses such powers, if they had not been expressly restrained; would, *389 in my opinion, be a political heresy, altogether inadmissible in our free republican governments.
ALL the restrictions contained in the Constitution of the United States on the power of the State Legislatures, were provided in favour of the authority of the Federal Government. The prohibition against their making any ex post facto laws was introduced for greater caution, and very probably arose from the knowledge, that the Parliament of Great Britain claimed and exercised a power to pass such laws, under the denomination of bills of attainder, or bills of pains and penalties; the first inflicting capital, and the other less, punishment. These acts were legislative judgments; and an exercise of judicial power. Sometimes they respected the crime, by declaring acts to be treason, which were not treason, when committed;[*] at other times, they violated the rules of evidence (to supply a deficiency of legal proof) by admitting one witness, when the existing law required two; by receiving evidence without oath; or the oath of the wife against the husband; or other testimony, which the courts of justice would not admit;[] at other times they inflicted punishments, where the party was not, by law, liable to any punishment;[] and in other cases, they inflicted greater punishment, than the law annexed to the offence.[]  The ground for the exercise of such legislative power was this, that the safety of the kingdom depended on the death, or other punishment, of the offender: as if traitors, when discovered, could be so formidable, or the government so insecure! With very few exceptions, the advocates of such laws were stimulated by ambition, or personal resentment, and vindictive malice. To prevent such, and similar, acts of violence and injustice, I believe, the Federal and State Legislatures, were prohibited from passing any bill of attainder; or any ex post facto law.
The Constitution of the United States, article 1, section 9, prohibits the Legislature of the United States from passing any ex post facto law; and, in section 10, lays several restrictions on the authority of the Legislatures of the several states; and, among them, "that no state shall pass any ex post facto law."
It may be remembered, that the legislatures of several of the states, to wit, Massachusetts, Pennsylvania, Delaware, Maryland, and North and South Carolina, are expressly prohibited, by their state Constitutions, from passing any ex post facto law.
*390 I shall endeavour to shew what law is to be considered an ex post facto law, within the words and meaning of the prohibition in the Federal Constitution. The prohibition, "that no state shall pass any ex post facto law," necessarily requires some explanation; for, naked and without explanation, it is unintelligible, and means nothing. Literally, it is only, that a law shall not be passed concerning, and after the fact, or thing done, or action committed. I would ask, what fact; of what nature, or kind; and by whom done? That Charles 1st. king of England, was beheaded; that Oliver Cromwell was Protector of England; that Louis 16th, late King of France, was guillotined; are all facts, that have happened; but it would be nonsense to suppose, that the States were prohibited from making any law after either of these events, and with reference thereto. The prohibition, in the letter, is not to pass any law concerning, and after the fact; but the plain and obvious meaning and intention of the prohibition is this; that the Legislatures of the several states, shall not pass laws, after a fact done by a subject, or citizen, which shall have relation to such fact, and shall punish him for having done it. The prohibition considered in this light, is an additional bulwark in favour of the personal security of the subject, to protect his person from punishment by legislative acts, having a retrospective operation. I do not think it was inserted to secure the citizen in his private rights, of either property, or contracts. The prohibitions not to make any thing but gold and silver coin a tender in payment of debts, and not to pass any law impairing the obligation of contracts, were inserted to secure private rights; but the restriction not to pass any ex post facto law, was to secure the person of the subject from injury, or punishment, in consequence of such law. If the prohibition against making ex post facto laws was intended to secure personal rights from being affected, or injured, by such laws, and the prohibition is sufficiently extensive for that object, the other restraints, I have enumerated, were unnecessary, and therefore improper; for both of them are retrospective.
I will state what laws I consider ex post facto laws, within the words and the intent of the prohibition. 1st. Every law that makes an action done before the passing of the law, and which was innocent when done, criminal; and punishes such action. 2d. Every law that aggravates a crime, or makes it greater than it was, when committed. 3d. Every law that changes the punishment, and inflicts a greater punishment, than the law annexed to the crime, when committed. 4th. Every law that alters the legal rules of evidence, and receives less, or different, testimony, than the law required at the time of the commission of the offence, in order to convict the offender. *391 All these, and similar laws, are manifestly unjust and oppressive. In my opinion, the true distinction is between ex post facto laws, and retrospective laws. Every ex post facto law must necessarily be retrospective; but every retrospective law is not an ex post facto law: The former, only, are prohibited. Every law that takes away, or impairs, rights vested, agreeably to existing laws, is retrospective, and is generally unjust, and may be oppressive; and it is a good general rule, that a law should have no retrospect: but there are cases in which laws may justly, and for the benefit of the community, and also of individuals, relate to a time antecedent to their commencement; as statutes of oblivion, or of pardon. They are certainly retrospective, and literally both concerning, and after, the facts committed. But I do not consider any law ex post facto, within the prohibition, that mollifies the rigor of the criminal law, but only those that create, or aggravate, the crime; or encrease the punishment, or change the rules of evidence, for the purpose of conviction. Every law that is to have an operation before the making thereof, as to commence at an antecedent time; or to save time from the statute of limitations; or to excuse acts which were unlawful, and before committed, and the like; is retrospective. But such laws may be proper or necessary, as the case may be. There is a great and apparent difference between making an UNLAWFUL act LAWFUL; and the making an innocent action criminal, and punishing it as a CRIME. The expressions "ex post facto laws," are technical, they had been in use long before the Revolution, and had acquired an appropriate meaning, by Legislators, Lawyers, and Authors. The celebrated and judicious Sir William Blackstone, in his commentaries, considers an ex post facto law precisely in the same light I have done. His opinion is confirmed by his successor, Mr. Wooddcson; and by the author of the Federalist, who I esteem superior to both, for his extensive and accurate knowledge of the true principles of Government.
I also rely greatly on the definition, or explanation of EX POST FACTO LAWS, as given by the Conventions of Massachusetts, Maryland, and North Carolina; in their several Constitutions, or forms of Government.
In the declaration of rights, by the convention of Massachusetts, part 1st. sect. 24, "Laws made to punish actions done before the existence of such laws, and which have not been declared CRIMES by preceeding laws, are unjust, &c."
In the declaration of rights, by the convention of Maryland, art. 15th, "Retrospective laws punishing facts committed before the existence of such laws, and by them only declared criminal, are oppressive, &c."
*392 In the declaration of rights by the convention of North Carolina, art. 24th, I find the same definition, precisely in the same words, as in the Maryland constitution.
In the declaration of Rights by the convention of Delaware, art. 11th, the same definition was clearly intended, but inaccurately expressed; by saying "laws punishing offences (instead of actions, or facts) committed before the existence of such laws, are oppressive, &c."
I am of opinion, that the fact, contemplated by the prohibition, and not to be affected by a subsequent law, was some fact to be done by a Citizen, or Subject.
In 2nd Lord Raymond 1352, Raymond, Justice, called the stat. 7 Geo. 1st. stat. 2 par 8, about registering Contracts for South Sea Stock, an ex post facto law; because it affected Contracts made before the statute.
In the present case, there is no fact done by Bull and wife Plaintiffs in Error, that is in any manner affected by the law or resolution of Connecticut: It does not concern, or relate to, any act done by them. The decree of the Court of Probate of Harford (on the 21st, March) in consequence of which Calder and wife claim a right to the property in question, was given before the said law or resolution, and in that sense, was affected and set aside by it; and in consequence of the law allowing a hearing and the decision in favor of the will, they have lost, what they would have been entitled to, if the Law or resolution, and the decision in consequence thereof, had not been made. The decree of the Court of probate is the only fact, on which the law or resolution operates. In my judgment the case of the Plaintiffs in Error, is not within the letter of the prohibition; and, for the reasons assigned, I am clearly of opinion, that it is not within the intention of the prohibition; and if within the intention, but out of the letter, I should not, therefore, consider myself justified to continue it within the prohibition, and therefore that the whole was void.
It was argued by the Counsel for the plaintiffs in error, that the Legislature of Connecticut had no constitutional power to make the resolution (or law) in question, granting a new hearing, &c.
Without giving an opinion, at this time, whether this Court has jurisdiction to decide that any law made by Congress, contrary to the Constitution of the United States, is void; I am fully satisfied that this court has no jurisdiction to determine that any law of any state Legislature, contrary to the Constitution of such state, is void. Further, if this court had such jurisdiction, yet it does not appear to me, that the resolution (or law) in question, is contrary to the charter of Connecticut, or its constitution, which is said by counsel to be composed of its *393 acts of assembly, and usages, and customs. I should think, that the courts of Connecticut are the proper tribunals to decide, whether laws, contrary to the constitution thereof, are void. In the present case they have, both in the inferior and superior courts, determined that the Resolution (or law) in question was not contrary to either their state, or the federal, constitution.
To shew that the resolution was contrary to the constitution of the United States, it was contended that the words, ex post facto law, have a precise and accurate meaning, and convey but one idea to professional men, which is, "by matter of after fact; by something after the fact." And Co. Litt. 241. Fearnes Con. Rem. (Old Ed.) 175 and 203. Powell on Devises 113, 133. 134. were cited; and the table to Coke's Reports (by Wilson) title ex post facto, was referred to. There is no doubt that a man may be a trespasser from the beginning, by matter of after fact; as where an entry is given by law, and the party abuses it; or where the law gives a distress, and the party kills, or works, the distress.
I admit, an act unlawful in the beginning may, in some cases, become lawful by matter of after fact.
I also agree, that the words "ex post facto" have the meaning contended for, and no other, in the cases cited, and in all similar cases; where they are used unconnected with, and without relation to, Legislative acts, or laws.
There appears to me a manifest distinction between the case where one fact relates to, and affects, another fact, as where an after fact, by operation of law, makes a former fact, either lawful or unlawful; and the case where a law made after a fact done, is to operate on, and to affect, such fact. In the first case both the acts are done by private persons. In the second case the first act is done by a private person, and the second act is done by the legislature to affect the first act.
I believe that but one instance can be found in which a British judge called a statute, that affected contracts made before the statute, an ex post facto law; but the judges of Great Britain always considered penal statutes, that created crimes, or encreased the punishment of them, as ex post facto laws.
If the term ex post facto law is to be construed to include and to prohibit the enacting any law after a fact, it will greatly restrict the power of the federal and state legislatures; and the consequences of such a construction may not be foreseen.
If the prohibition to make no ex post facto law extends to all laws made after the fact, the two prohibitions, not to make anything but gold and silver coin a tender in payment of debts; and not to pass any law impairing the obligation of contracts, were improper and unnecessary.
*394 It was further urged, that if the provision does not extend to prohibit the making any law after a fact, then all choses in action; all lands by Devise; all personal property by bequest, or distribution; by Elegit; by execution; by judgments, particularly on torts; will be unprotected from the legislative power of the states; rights vested may be divested at the will and pleasure of the state legislatures; and, therefore, that the true construction and meaning of the prohibition is, that the states pass no law to deprive a citizen of any right vested in him by existing laws.
It is not to be presumed, that the federal or state legislatures will pass laws to deprive citizens of rights vested in them by existing laws; unless for the benefit of the whole community; and on making full satisfaction. The restraint against making any ex post facto laws was not considered, by the framers of the constitution, as extending to prohibit the depriving a citizen even of a vested right to property; or the provision, "that private property should not be taken for PUBLIC use, without just compensation," was unnecessary.
It seems to me, that the right of property, in its origin, could only arise from compact express, or implied, and I think it the better opinion, that the right, as well as the mode, or manner, of acquiring property, and of alienating or transferring, inheriting, or transmitting it, is conferred by society; is regulated by civil institution, and is always subject to the rules prescribed by positive law. When I say that a right is vested in a citizen, I mean, that he has the power to do certain actions; or to possess certain things, according to the law of the land.
If any one has a right to property such right is a perfect and exclusive right; but no one can have such right before he has acquired a better right to the property, than any other person in the world: a right, therefore, only to recover property cannot be called a perfect and exclusive right. I cannot agree, that a right to property vested in Calder and wife, in consequence of the decree (of the 21st. of March 1783) disapproving of the will of Morrison, the Grandson. If the will was valid, Mrs. Calder could have no right, as heiress of Morrison, the physician; but if the will was set aside, she had an undoubted title.
The resolution (or law) alone had no manner of effect on any right whatever vested in Calder and wife. The Resolution (or law) combined with the new hearing, and the decision, in virtue of it, took away their right to recover the property in question. But when combined they took away no right of property vested in Calder and wife; because the decree against the will (21st. March 1783) did not vest in or transfer any property to them.
*395 I am under a necessity to give a construction, or explanation of the words, "ex post facto law," because they have not any certain meaning attached to them. But I will not go farther than I feel myself bound to do; and if I ever exercise the jurisdiction I will not decide any law to be void, but in a very clear case.
I am of opinion, that the decree of the Supreme Court of Errors of Connecticut be affirmed, with costs.
PATERSON, Justice.
The Constitution of Connecticut is made up of usages, and it appears that its Legislature have, from the beginning, exercised the power of granting new trials. This has been uniformly the case till the year 1762, when this power was, by a legislative act, imparted to the superior and county courts. But the act does not remove or annihilate the pre-existing power of the Legislature, in this particular; it only communicates to other authorities a concurrence of jurisdiction, as to the awarding of new trials. And the fact is, that the Legislature have, in two instances, exercised this power since the passing of the law in 1762. They acted in a double capacity, as a house of legislation, with undefined authority, and also as a court of judicature in certain exigencies. Whether the latter arose from the indefinite nature of their legislative powers, or in some other way, it is not necessary to discuss. From the best information, however, which I have been able to collect on this subject, it appears, that the Legislature, or general court of Connecticut, originally possessed, and exercised all legislative, executive, and judicial authority; and that, from time to time, they distributed the two latter in such manner as they though proper; but without parting with the general superintending power, or the right of exercising the same, whenever they should judge it expedient. But be this as it may, it is sufficient for the present to observe, that they have on certain occasions, exercised judicial authority from the commencement of their civil polity. This usage makes up part of the Constitution of Connecticut, and we are bound to consider it as such, unless it be inconsistent with the Constitution of the United States. True it is, that the awarding of new trials falls properly within the province of the judiciary; but if the Legislature of Connecticut have been in the uninterrupted exercise of this authority, in certain cases, we must, in such cases, respect their decisions as flowing from a competent jurisdiction, or constitutional organ. And therefore we may, in the present instance, consider the Legislature of the state, as having acted in their customary judicial capacity. If so, there is an end of the question. For if the power, thus exercised, comes more properly within the description of a judicial than of a legislative power; and if by usage or the *396 Constitution, which, in Connecticut, are synonimous terms, the Legislature of that state acted in both capacities; then in the case now before us, it would be fair to consider the awarding of a new trial, as an act emanating from the judiciary side of the department. But as this view of the subject militates against the Plaintiffs in error, their counsel has contended for a reversal of the judgment, on the ground, that the awarding of a new trial, was the effect of a legislative act, and that it is unconstitutional, because an ex post facto law. For the sake of ascertaining the meaning of these terms, I will consider the resolution of the General court of Connecticut, as the exercise of a legislative and not a judicial authority. The question, then, which arises on the pleadings in this cause, is, whether the resolution of the Legislature of Connecticut, be an ex post facto law, within the meaning of the Constitution of the United States? I am of opinion, that it is not. The words, ex post facto, when applied to a law, have a technical meaning, and, in legal phraseology, refer to crimes, pains, and penalties. Judge Blackstone's description of the terms is clear and accurate. "There is, says he, a still more unreasonable method "than this, which is called making of laws, ex post facto, "when after an action, indifferent in itself, is committed, the "Legislator, then, for the first time, declares it to have been "a crime, and inflicts a punishment upon the person who has "committed it. Here it is impossible, that the party could "foresee that an action, innocent when it was done, should "be afterwards converted to guilt by a subsequent law; he "had, therefore, no cause to abstain from it; and all punishment "for not abstaining, must, of consequence, be cruel and "unjust." 1 Bl. Com. 46. Here the meaning, annexed to the terms ex post facto laws, unquestionably refers to crimes, and nothing else. The historic page abundantly evinces, that the power of passing such laws should be withheld from legislators; as it is a dangerous instrument in the hands of bold, unprincipled, aspiring, and party men, and has been two often used to effect the most detestable purposes.
On inspecting such of our state Constitutions, as take notice of laws made ex post facto, we shall find, that they are understood in the same sense.
The Constitution of Massachusetts, article 24th of the Declaration of rights:
"Laws made to punish for actions done before the existence of such laws, and which have not been declared crimes by preceding laws, are unjust, oppressive, and inconsistent with the fundamental principles of a free government."
The Constitution of Delaware, article 11th of the Declaration of Rights:
*397 "That retrospective laws punishing offences committed be fore the existence of such laws, are oppressive and unjust, and ought not to be made."
The Constitution of Maryland, article 15th of the Declaration of Rights:
"That retrospective laws, punishing facts committed before the existence of such laws, and by them only declared criminal, are oppressive, unjust, and incompatible with liberty; wherefore no ex post facto law ought to be made."
The Constitution of North Carolina, article 24th of the Declaration of Rights:
"That retrospective laws, punishing facts committed before the existence of such laws, and by them only declared criminal, are oppressive, unjust, and incompatible with liberty; wherefore no ex post facto law ought to be made."
From the above passages it appears, that ex post facto laws have an appropriate signification; they extend to penal statutes, and no further; they are restricted in legal estimation to the creation, and, perhaps, enhancement of crimes, pains and penalties. The enhancement of a crime, or penalty, seems to come within the same mischief as the creation of a crime or penalty; and therefore they may be classed together.
Again, the words of the Constitution of the United States are, "That no State shall pass any bill of attainder, ex post "facto law, or law impairing the obligation of contracts." Article 1st. section 10.
Where is the necessity or use of the latter words, if a law impairing the obligation of contracts, be comprehended within the terms ex post facto law? It is obvious from the specification of contracts in the last member of the clause, that the framers of the Constitution, did not understand or use the words in the sense contended for on the part of the Plaintiffs in Error. They understood and used the words in their known and appropriate signification, as referring to crimes, pains, and penalties, and no further. The arrangement of the distinct members of this section, necessarily points to this meaning.
I had an ardent desire to have extended the provision in the Constitution to retrospective laws in general. There is neither policy nor safety in such laws; and, therefore, I have always had a strong aversion against them. It may, in general, be truly observed of retrospective laws of every description, that they neither accord with found legislation, nor the fundamental principles of the social compact. But on full consideration, I am convinced, that ex post facto laws must be limited in the manner already expressed; they must be taken in their technical, which is also their common and general, acceptation, and are not to be understood in their literal sense.
*398 IREDELL, Justice.
Though I concur in the general result of the opinions, which have been delivered, I cannot entirely adopt the reasons that are assigned upon the occasion.
From the best information to be collected, relative to the Constitution of Connecticut, it appears, that the Legislature of that State has been in the uniform, uninterrupted, habit of exercising a general superintending power over its courts of law, by granting new trials. It may, indeed, appear strange to some of us, that in any form, there should exist a power to grant, with respect to suits depending or adjudged, new rights of trial, new privileges of proceeding, not previously recognized and regulated by positive institutions; but such is the established usage of Connecticut, and it is obviously consistent with the general superintending authority of her Legislature Nor is it altogether without some sanction for a Legislature to act as a court of justice. In England, we know, that one branch of the Parliament, the house of Lords, not only exercises a judicial power in cases of impeachment, and for the trial of its own members, but as the court of dernier resort, takes cognizance of many suits at law, and in equity: And that in construction of law, the jurisdiction there exercised is by the King in full Parliament; which shews that, in its origin, the causes were probably heard before the whole Parliament. When Connecticut was settled, the right of empowering her Legislature to superintend the Courts of Justice, was, I presume, early assumed; and its expediency, as applied to the local circumstances and municipal policy of the State, is sanctioned by a long and uniform practice. The power, however, is judicial in its nature; and whenever it is exercised, as in the present instance, it is an exercise of judicial, not of legislative, authority.
But, let us, for a moment, suppose, that the resolution, granting a new trial, was a legislative act, it will by no means follow, that it is an act affected by the constitutional prohibition, that "no State shall pass any ex post facto law." I will endeavour to state the general principles, which influence me, on this point, succinctly and clearly, though I have not had an opportunity to reduce my opinion to writing.
If, then, a government, composed of Legislative, Executive and Judicial departments, were established, by a Constitution, which imposed no limits on the legislative power, the consequence would inevitably be, that whatever the legislative power chose to enact, would be lawfully enacted, and the judicial power could never interpose to pronounce it void. It is true, that some speculative jurists have held, that a legislative act against natural justice must, in itself, be void; but I cannot think that, under such a government, any Court of Justice would possess a power to declare it so. Sir William Blackstone, having put the strong case of an act of Parliament, which *399 authorise a man to try his own cause, explicitly adds, that even in that case, "there is no court that has power to defeat the intent of the Legislature, when couched in such evident and express words, as leave no doubt whether it was the intent of the Legislature, or no." 1 Bl. Com. 91.
In order, therefore, to guard against so great an evil, it has been the policy of all the American states, which have, individually, framed their state constitutions since the revolution, and of the people of the United States, when they framed the Federal Constitution, to define with precision the objects of the legislative power, and to restrain its exercise within marked and settled boundaries. If any act of Congress, or of the Legislature of a state, violates those constitutional provisions, it is unquestionably void; though, I admit, that as the authority to declare it void is of a delicate and awful nature, the Court will never resort to that authority, but in a clear and urgent case. If, on the other hand, the Legislature of the Union, or the Legislature of any member of the Union, shall pass a law, within the general scope of their constitutional power, the Court cannot pronounce it to be void, merely because it is, in their judgment, contrary to the principles of natural justice. The ideas of natural justice are regulated by no fixed standard: the ablest and the purest men have differed upon the subject; and all that the Court could properly say, in such an event, would be, that the Legislature (possessed of an equal right of opinion) had passed an act which, in the opinion of the judges, was inconsistent with the abstract principles of natural justice. There are then but two lights, in which the subject can be viewed: 1st. If the Legislature pursue the authority delegated to them, their acts are valid. 2d. If they transgress the boundaries of that authority, their acts are invalid. In the former case, they exercise the discretion vested in them by the people, to whom alone they are responsible for the faithful discharge of their trust: but in the latter case, they violate a fundamental law, which must be our guide, whenever we are called upon as judges to determine the validity of a legislative act.
Still, however, in the present instance, the act or resolution of the Legislature of Connecticut, cannot be regarded as an ex post facto law; for, the true construction of the prohibition extends to criminal, not to civil, cases. It is only in criminal cases, indeed, in which the danger to be guarded against, is greatly to be apprehended. The history of every country in Europe will furnish flagrant instances of tyranny exercised under the pretext of penal dispensations. Rival factions, in their efforts to crush each other, have superseded all the forms, and suppressed all the sentiments, of justice; while attainders, on the principle of retaliation and proscription, have marked all the *400 vicissitudes of party triumph. The temptation to such abuses of power is unfortunately too alluring for human virtue; and, therefore, the framers of the American Constitutions have wisely denied to the respective Legislatures, Federal as well as State, the possession of the power itself: They shall not pass any ex post facto law; or, in other words, they shall not inflict a punishment for any act, which was innocent at the time it was committed; nor increase the degree of punishment previously denounced for any specific offence.
The policy, the reason and humanity, of the prohibition, do not, I repeat, extend to civil cases, to cases that merely affect the private property of citizens. Some of the most necessary and important acts of Legislation are, on the contrary, founded upon the principle, that private rights must yield to public exigences. Highways are run through private grounds. Fortifications, Light-houses, and other public edifices, are necessarilly sometimes built upon the soil owned by individuals. In such, and similar cases, if the owners should refuse voluntarily to accommodate the public, they must be constrained, as far as the public necessities require; and justice is done, by allowing them a reasonable equivalent. Without the possession of this power the operations of Government would often be obstructed, and society itself would be endangered. It is not sufficient to urge, that the power may be abused, for, such is the nature of all power,  such is the tendency of every human institution: and, it might as fairly be said, that the power of taxation, which is only circumscribed by the discretion of the Body, in which it is vested, ought not to be granted, because the Legislature, disregarding its true objects, might, for visionary and useless projects, impose a tax to the amount of nineteen shillings in the pound. We must be content to limit power where we can, and where we cannot, consistently with its use, we must be content to repose a salutary confidence. It is our consolation that there never existed a Government, in ancient or modern times, more free from danger in this respect, than the Governments of America.
Upon the whole, though there cannot be a case, in which an ex post facto law in criminal matters is requisite, or justifiable (for Providence never can intend to promote the prosperity of any country by bad means) yet, in the present instance the objection doesnot arise: Because, 1st. if the act of the Legislature of Connecticut was a judicial act, it is not within the words of the Constitution; and 2d. even if it was a legislative act, it is not within the meaning of the prohibition.
CUSHING, Justice.
The case appears to me to be clear of all difficulty, taken either way. If the act is a judicial act, it is not touched by the Federal Constitution: and, if it is a legislegislative *401 act, it is maintained and justified by the ancient and uniform practice of the state of Connecticut.
JUDGMENT affirmed.
NOTES
[*] The case of the Earl of Strafford, in 1641.
[] The case of Sir John Fenwick, in 1696.
[] The banishment of Lord Clarendon, 1669 (19 Ca. 2. c. 10.) and of the Bishop of Atterbury, in 1723, (9 Geo. 1. c. 17.)
[] The Coventry act, in 1670, (22 & 23 Car. 2 c. 1.)