## ROBERT FORSYTH vs. HORATIO MARBURY.

*Fi. Fa.    Levy on land and claim interposed by Mulford Marsh.*

A judgment in Georgia constitutes a *lien* from its date on all the property of the debtor, and is constructive notice to all the world.

And this lien is effectual against all subsequent claims to the property derived from and thro' the debtor.

*Quære*, if such lien is retained on property of debtor sold under a junior judgment, or attaches itself solely on the proceeds of the sale.

The words " *ex post facto* laws" are to be applied exclusively to *criminal* law.

A State law which impairs the obligation of a contract, made *prior* to its passage, is unconstitutional and inoperative.

And it is equally so, whether the contract exists in its original shape, or has been merged in a judgment.

A statute of limitations to be constitutional and operative, must give an allowance of time *in futuro*, to commence the action.

A law which prohibits a levy on a portion of the debtor's property, previously subject to an existing judgment, is unconstitutional, as it impairs the *obligation* of a contract.

*Quære*, if a statute which acts retrospectively and divests a vested right, but does not impair the obligation of a contract, be absolutely void.

A statute should be construed, (if consistent with its general scope,) so as to give it a prospective operation, where a contrary construction would divest a vested right.

The Act of 19th December, 1822, which protects the property of the debtor from levy under a judgment, where such property for a definite period, had been in possession of a purchaser for reasonable compensation, and without actual notice of such judgment, may properly be construed so as to refer only to levies founded on judgments obtained *since* its passage.

Such statute introduces a new rule of law, and is not declaratory of the old.

A claimant in a claim case is confined to his own right, and cannot set up an outstanding title in a third person, to defeat the levy of plaintiff.

Where substantial justice has been done by the verdict, a new trial will not be granted, although there may have been error.

## By LAW, Judge.

THE questions which I am called upon to adjudicate in this case, as made upon the motion of the plaintiff in execution for a new trial, are two fold, viz: 1st, the validity and construction of the Act of the Legislature of Georgia, passed in 1822, (*Foster's*

Dig. 162,) entitled an Act to amend the 26th section of the judiciary act of 16th December, 1799, (*Prince's* Dig. 211,) and also to prevent a fraudulent enforcement of dormant judgments; 2dly, whether a claimant, in a claim case, under the statutes of Georgia, 1799, (*Prince* 213,) and 1821, (*Foster* 155,) can protect himself, or defeat the plaintiff's right to levy and sell, by resorting to an outstanding title in a third person, not a party to the issue, and with whom he claims no privity.

1. Then, the validity and construction of the Act of 1822.

It is a principle of the English law that lands are bound from the time of the judgment, so that execution may be of these, though the party alienes bona fide before execution sued out. The remedy afforded the judgment creditor however by the common law, merely enabled him to hold the land in trust until the debt was discharged by the receipt of the rents and profits. In 1732, was passed the statute 5 George II., c. 7, which made lands &c. within the English colonies, chargeable with debts and subject to be dealt with on execution, precisely as personal estate. The various statutory provisions in England, in favor of purchasers, are superceded by our own legislation. By the Act of 1789, (*Watk.* Dig. 391,) all the property of the defendant in execution, was bound from the signing judgment. By the Act of 1792, (*Watk.* Dig. 481,) all the property of the defendant was bound from the day of signing judgment. Then came the Act of 1797, (*Watk.* 630, *Mar. & Craw.* 280,) all the property bound from the day of obtaining the first verdict. And lastly, the Act of 1799, which bound all the property from the signing the first judgment. It is not apprehended, that the statute of 5 George II., c. 7, just referred to, touches the question of lien ; it only enabled the land to be sold *absolutely* as personal property, but the execution had relation back, so as to bind from the judgment. The execution under which the levy is made, was issued upon a judgment recovered in 1791. Whether we look to the English law, or to the various statutes of Georgia

upon this subject, it is manifest that the judgment creditor in Georgia, acquired a lien upon all the property of his debtor in lands, as well as personal property. The nature and character of the interest thus gained by the creditor in the debtor's property, the duration and continuance of the lien, and its effect upon the subsequently acquired interest of third persons, as alienees, mortgagees, and junior judgment creditors deserve our consideration. It is not an absolute right in the property itself which the creditor obtains by his judgment. The legal title is not transferred from the debtor to the creditor. He has, however, a special interest, which although indefinite in extent, may be rendered definite by a levy; an equitable interest which is perfected by the sale, the Sheriff's deed completing the transfer of the property itself, and conveying the legal title. The master of the Rolls in *Brace* vs. *Duchess of Marlborough*, (2 *Pee : Williams*, 491,) says, a judgment creditor has no right to the land, he has neither a *jus in re* nor *ad rem*. All that he has, is a lien upon the land. The Supreme Court of the United States, (in *Conard* vs. *Atlantic Insurance Company*, 1 Pet. S. C. Rep. 443,) say, it is not understood that a general lien by judgment on land constitutes *per se* a property or right in the land itself. It only confers a right to levy on the same to the exclusion of other adverse interests subsequent to the judgment ; and when the levy is actually made on the same, the title of the creditor for this purpose relates back to the time of his judgment, so as to cut out intermediate incumbrances. He has no *jus in re*, but a power to make his general lien effectual, by following up the steps of the law and consummating his judgment by an execution and levy on the land. Thus, whilst the creditor acquires no absolute property in the estate of his debtor, he has an interest which is capable of being defined, and which cannot be defeated, save by some act of the party himself, by which it shall be lost or displaced. By pursuing the means pointed out to him by law, he is capable of converting his general lien into a specific title, which relating back to the date of his judgment, must prevail over all subsequent-

ly acquired adverse interests and rights; and thus, this lien affords complete security against subsequent purchasers and incumbrances. Before this is done, the debtor having the legal title, it is true, may sell or incumber the property, but whoever takes it, must hold it subject to the lien, which lien growing out of matter of record is constructive notice to all the world. A purchaser can acquire no other rights than those which were vested in the seller, in whose shoes he stands. So if the property be levied on by a junior judgment; it is still subject to the lien of the elder judgment. In the language of Ch. J. *Marshall*, "the circumstance of not proceeding upon an elder judgment, until a subsequent lien has been obtained and carried into execution, will not displace the prior lien." (*Rankin, et. al.* vs. *Scott*, 12 *Wheat.* 179.) Both these cases in the U. S. Supreme Court establish the position, that a purchaser under a junior judgment, at public sheriff's sales, would hold the property subject to the lien of the elder judgment. I forbear the expression of an opinion on this point, the practice with us, (at least in the Eastern Circuit,) having been to allow the senior creditor to claim the proceeds of sales.* But in either event, the rights of the elder judgment creditor would be protected. It remains to observe that there being no limited period for the termination of this lien, it is indefinite in its duration and continuance—and being thus perpetual, can only be discharged by payment and satisfaction of the debt, or as before remarked lost or displaced by some act of the party himself.

It results from this view of the subject, that at the passage of the Act of 1822, the plaintiff in execution had a lien upon the property of the defendant, which followed it into the hands of purchasers, which was not barred by any statute of limitations, and which,

---

* A purchaser at Sheriff's sales under a judgment, does not take the land subject to a previous judgment, obtained against the former owner of the land, unless it was sold expressly, subject to such prior judgment. The proceeds are distributed, however, according to the priority of the liens. *Commonwealth* vs. *Alexander*, (14 *Serg. & Rawl.* 257.) *U. S.* vs. *Mechanics' Bank*, (*Gilpin's* Rep. 57.)—(*Ed.*)

consequently, could not be divested or defeated by any sale or transfer from the defendant in execution. The application of the statute of 1822 to the case before me, requires a construction by which it is made to retrospect, and by giving it operation anterior to its passage, to divest and take away from the plaintiff, this vested right and interest, which, as has just been shewn, had been acquired under the then existing laws of the State.

1. The enquiry for us is, whether there is any provision in the Constitution of this State, or of the United States, controlling and inhibiting retrospective legislation affecting vested rights in civil matters.

2. Whether apart from any express inhibition in the Constitution there be any universally admitted principle of natural right and justice, possessing a restraining influence over the Legislature and amounting to absolute prohibition to pass any law violative of its dictates.

3. Apart from the idea of absolute prohibition, we will consider the effect of such a principle upon the construction of a statute, where there is room for construction.

4. How far the act under consideration may be viewed as merely declaratory, and therefore susceptible of the construction maintained by the claimant.

In the Constitution of the United States it is declared, that no State shall pass any *ex post facto* law, or law impairing the obligation of contracts. In the Constitution of the State of Georgia, it is said no *ex post facto* law shall be passed.

These words *ex post facto*, as defined by *Blackstone*, (1 vol. *Com.* 46,) and as understood and explained by all the judicial tribunals both State and Federal, have been so universally applied to *criminal* in exclusion of *civil* law, that however just and necessary the extension of their sense and meaning, to embrace the latter, might

seem to me, I could scarcely feel myself at liberty so to adjudge.[*] It is true, that in a late case an enlightened Jurist upon the bench of the Supreme Court, United States, (Mr. Justice *Johnson* in *Satterlee* vs. *Matthewson*, 2 Pet. S. C. Rep. 414,) very decidedly expressed a different opinion, and has appended a valuable note containing some useful research and learning upon the subject at the end of the 2d vol. *Peters*' Rep. Yet the decision of that Court as made in the case of *Calder* and *wife* vs. *Bull* and *wife*, (3 Dall. 386,) stands unchanged and has never been renounced by the Court, and it will, I presume, control the meaning of these words so long as it does remain.

No State shall pass any law impairing the obligations of contracts. However in the interpretation of these words, the most distinguished Jurists of our country have differed, when considering their effect in restraining the enactment of laws, which would, *prospectively* considered, impair the obligation of contracts, (as an insolvent law which discharges the future acquisitions of the debtor,) all have concurred in their entire efficacy to prevent such laws from operating upon contracts made *before* the passage of the law. If it shall appear, therefore, that the obligation of this original contract, although the contract itself be merged in the plaintiff's judgment, would be impaired by the construction contended for by the claimant, then it is obvious that the Legislature could not in the most direct terms pass such a law, and as a necessary consequence the Courts would not be authorized so to construe it, if it were susceptible of any other construction, by which the Act could be maintained. I say notwithstanding the contract itself be merged in judgment, for although it has been decided that a judgment is no contract, (*Bidleson* vs. *Whytel*, 3

---

[*] *Calder* vs. *Bull*, (3 Dall. Rep. 386.) *Fletcher* vs. *Peck*, (6 Cranch. 138.) *Ogden* vs. *Saunders*, (12 Wheaton 266. *Satterlee* vs *Mathewson*, (2 Peters U. S. Rep. 380.) *Watson, et al.* vs. *Mercer*, (8 Pet. S. C. Rep. 110.)—(*Ed.*)

PART II.—Q. 2.

Burr. 1548,) yet the expression in the Constitution is not to impair the contract, but its obligation. And this obligation, according to all the Judges of the Supreme Court of the United States, means the legal obligation as contradistinguished from the moral, or it is the liability to pay and to perform, which the law at once imposes as consequent upon the contract. Now whatever shape the contract may assume, the obligation remains until it is actually discharged, or until the law will imply its discharge from circumstances. Any law, therefore, which impairs not the original contract, but this obligation, whether the contract remains in its original shape, or has been merged in a judgment, it seems to me, ought to be considered, as within the operation of this provision of the Constitution. And indeed upon the other view, the Constitution would be no protection, since a man would be compelled to carry his contract into judgment before he can enforce it. But how is this obligation impaired? Neither the original contract, nor the judgment is nullified, or rendered void. It will be recollected that at the passage of the Act of 1822, under consideration, the plaintiff in execution had, by virtue of his judgment, a lien upon *all* the property of the defendant, that this lien followed the property into the hands of a *bona fide* purchaser for valuable consideration, he being bound by the constructive notice afforded by the record of the judgment; that it continued to exist for an indefinite period of time, there being no limitation to bar it; in short, that the right of the plaintiff in execution to levy upon and sell the property of the defendant, although in the hands of a *bona fide* purchaser, was a perfect and a vested right, which could only be divested by satisfaction of the debt or some act of the party claiming it. The Act in question construed, so as to apply to this case, would prevent the enforcement of the judgment upon such portion of the defendant's property as had been sold to a *bona fide* purchaser, in whose possession it had remained for seven years, although such possession had been accomplished before the passage of the law. This law may be considered as a statute of limitation, which operates to

[Robert Forsyth vs. Horatio Marbury.]

bar a judgment—for, whilst it quits the possession of the purchaser, it takes away from the judgment creditor the right to levy and sell.  It is again, the suspension or denial of the remedy *in toto* upon a certain portion of the debtor's property, or what is in effect the same, it is the exemption of a part of the debtor's property from its liability to the payment of the judgment.  Viewed as a statute of limitations, there is nothing to prevent the Legislature from fixing a time within which a judgment shall be enforced, as well as to pass any other act of limitations.  But then, to make any statute of limitations constitutional, there must be an allowance of time in *futuro* to commence the action in the one case, or enforce the judgment in the other.  Such statutes are then nothing more than a new rule of evidence which the Legislature have a right to impose.  But if there be no allowance of time within which to enforce existing and vested rights, after the passage of the law, the effect is as completely to destroy the right, as if the contract were annulled or the judgment rendered void.  Whilst the right to regulate the remedy in its own Courts, must be incident to each State, who may modify and change it as the welfare of society may require, and whilst as a consequence of this, a law, changing or affecting the remedy only, is not considered as impairing the obligation of the contract, yet an absolute denial of the remedy amounting to an exemption of any portion of the property must necessarily impair the obligation of the contract.  The distinction has often been asserted between a law changing or modifying the remedy only, and a law which so completely takes away the remedy as to destroy the right.  In the great case of *Ogden* and *Saunders*, (12 Wheat. 213,) one of the Judges says, " a law which in any shape exempts any portion of a man's property, must impair the obligation of the contract."  Obviously if you take away the means of enforcing the contract, the power of coercion, the *legal obligation* is gone.  The act in question not only takes away the right to enforce the judgment upon the specific property, but it actually and in direct terms confers an

adversary right, by vesting it absolutely in the purchaser discharged of the lien. In the view which I take, therefore, upon this subject, the act under consideration is not susceptible in consistency with the Constitution of the United States, of *the* construction maintained by the claimant. If I am correct here, it would be unnecessary for me to do more than enquire whether the act be susceptible of a construction which might stand with the Constitution. But there are other considerations equally decisive, in my estimation, in rejecting the construction sought for. I proceed, therefore, to observe,

2. That the application of this statute to the present case, it has been seen, depends upon a construction which causes it to retrospect so as to take away a vested right. What is a vested right? One of the Judges of the Supreme Court, says, it is when a man has the power to do a certain action, or to possess certain things, according to the law of the land. It has been shewn that under the existing laws, at the time, the plaintiff in execution had acquired a right to levy upon and sell the property of the defendant, and thus to convert it, or its proceeds to his own use, in exclusion of every person in the world. The construction desired, takes away this existing right and imposes an absolute disability. In Dr. *Bonham's* case, (8 Rep. 118,) Lord *Coke* says: "It appears in our books, that in many cases, the common law will control acts of Parliament, and some times adjudge them to be utterly void; for when an act of Parliament is against common right and reason, or repugnant or impossible to be performed, the common law will control it and adjudge such act to be void." Perhaps more than a century and a half has elapsed since an English bench of Judges has ventured to declare an act of Parliament void, for being unconstitutional or against the principles of common right and reason. This is the genius of the government, the absolute supremacy and omnipotency of Parliament. With us the separation of the different departments of the government, with their respective

rights and powers, being defined by a written constitution, are
better understood.    There are acts which the Legislature cannot
do, although not expressly prohibited by the constitution.    An
act of the Legislature, contrary to the great first principles of the
social compact, cannot be considered a rightful exercise of legis-
lative authority.    In a late case, (*Wilkinson* vs. *Leland*, 2 Pet. S.
C. Rep. 658,) the Supreme Court of the United States say, " we
know of no case in which a legislative act to transfer the property
of A. to B. without his consent, has ever been held a constitution-
al exercise of legislative power in any State of the Union.    On
the contrary it has been constantly resisted as inconsistent with
just principles by every judicial tribunal, in which it has been at-
tempted to be enforced."    Such a case, I remark, and others
which might be enumerated, are so palpably unjust, that it shocks
the common sense of every man, and leads to the conviction, that
under such legislation, there would be an end of private property.
Yet to determine upon the particular cases as they arise, which
are obnoxious to these principles, is so delicate an exercise of au-
thority, and the intrinsic difficulty of applying rules of construc-
tion to the Constitution so as to embrace cases within its spirit and
equity, though not within its letter, so great, that I forbear to de-
cide, as it certainly is not necessary I should decide in this parti-
cular case, that a retrospective act which takes away a vested right,
but which cannot be construed to come within the provision of the
Constitution as to contracts, is absolutely void.*    But I am pre-
pared to decide under the third point proposed—That wherever an
act is susceptible of a prospective operation which, although not
favoured by the exact letter, may yet well stand with the general
scope of the statute, it shall be so construed, rather than retroact,

---

* " Retrospective laws which do not impair the obligation of contracts, or partake of the cha-
racter of *ex post facto* laws are not condemned or forbidden, by any part of the Constitution of
the United States." (*Satterlee* vs. *Matthewson*, 2 Pet. S. C. Rep. 413.) (*Watson* vs. *Mercer*,
8 Pet. S. C. Rep. 110, S. P.)    But see 3 *Kent's Com.* (3d edit.) 455, and cases cited in note (*d.*)
—(*Ed.*)

so as to take away a vested right. The rule established in England from the earliest history of the common law, as derived from *Bracton* and *Coke* is to limit the operation of the statute to the passage of the law; behind this period it may not retrospect. This is the sound rule of construction where there is room for construction. *Nova constitutio futuris formam debet imponere, non præteritis,* (6 Bac. Ab: 370.) The King's Bench in England would not construe the statute of frauds and perjuries so as to take away an action brought after the period designated in the statute upon a *parol* promise made before. (1 *Helmore* vs. *Shuter,* or as it is called in some of the books *Gillmore* vs. *Shuter,* 2 Show. 17. 2 Mod. 310. 1 Freem. 466. 2 Lev. 227. 2 Jones, 108. 1 Vent. 330.) The same principle was again recognized upon another statute, by Lord *Mansfield,* (4 Burr. 2460.) The Supreme Court of the United States in 1804, (*Ogden* vs. *Blackledge,* 2 Cranch. 277,) decided that a statute could not be construed retrospectively so as to take away a vested right. In 1811 was decided in New-York the case of *Dash* vs. *Van Kleeck,* (7 John. Rep. 477,) which will be found an interesting case upon this subject from the enlarged and full view taken of it by the Judges. It was decided by a majority of the court, that an Act of the Legislature is not to be construed retrospectively so as to take away a vested right. In *Ogden* and *Saunders,* (12 Wheat. 213,) the Judges speak of retrospective laws as oppressive, unjust and tyrannical, and as such, condemned by the universal sentence of civilized men. I am not authorized to impute to the Legislature a violation of principles so often and so solemnly advanced; principles which lie at the foundation of the rights of private property, and which are "alike dear to freedom and to justice." It remains to enquire whether the statute under consideration be susceptible of a construction which will relieve it from this imputation. Statutes are not always to be construed according to the letter. General expressions may be some times restrained; and the statute made to bear a construction reasonable and convenient, and comporting with the probable intention of the Legislature.

[Robert Forsyth vs. Horatio Marbury.]

The act of 1822, Sec. 4, provides, " that no judgment shall be enforced by the sale of any real or personal estate which the defendant may have sold and conveyed to a purchaser, for a reasonable consideration, and without actual notice of such judgment, *Provided* such purchaser or those claiming under him by such sale and conveyance, as aforesaid, shall by virtue of such sale and conveyance have been in peaceable possession of such real estate seven years, and of such personal estate four years before the levy shall have been made thereon." By the statute of frauds and perjuries, it was enacted that from and after the 24th June, 1677, no action should be brought to charge any person upon any agreement &c., unless such agreement be in writing. Here it will be observed, the words are positive, *no action shall be brought.* This statute too has ever had the most liberal construction ; yet as we have seen in the case of *Gillmore* vs. *Shuter*, though the action was brought subsequently to the 24th of June, 1677, the statute was held inapplicable, because the promise had been made before the passage of the Act. The Act of New-York, 1810, concerning escapes, enacts, that nothing contained in the Act relative to gaol and gaol liberties shall be so construed, as to prevent any Sheriff in case of escapes, from availing himself as a common law, of a defence arising from recaption, &c. Judge *Spencer* (in *Dash* vs. *Van Kleeck*, 7 John. Rep. 486,) says, this act does not in terms notice suits then existing, or escapes which had then taken place ; but it does what is tantamount. And yet the court decided, that it could not apply to an escape which had previously occurred. But the case which is most in point with that under consideration, is the case of *Society, &c.* vs. *Wheeler*, (2 Galhson, 141.) It was declared by the third section of an Act of the State of New Hampshire, " That when any action shall be brought against any person, for the recovery of any lands or tenements, which such person holds by virtue of a supposed legal title under a *bona fide* purchase, under which the occupant or the person under whom he claims has been in the actual peaceable possession and improve-

ment of, for more than six years before the commencement of the
action &c." The Act then goes on to declare that the jury which
tries the action, shall find the value of the buildings and improve-
ments made by such person, or those under whom he claims and
that no writ of seizure or possession shall issue upon such judg-
ment, until the plaintiff shall have paid such sum, &c. Judge
*Story* says, "the present action was brought in 1807, and if, as
the tenants contend, the Act applies to it, it must be upon the
ground that the six years possession under a supposed legal title is
to be calculated backwards, from the time of the commencement
of the action, although that time should not have elapsed after the
date of the Act, and in this view, the argument to support it, must
be the same as though the action were commenced immediately
after the passage of the Act." This construction the learned Judge
rejects as being contrary to the constitution of New Hampshire,
but gives it a prospective operation, so as to apply to improvements
made after the statute, and when the possession has been for six
years after the date of the Act. It will be observed that the lan-
guage there "is six years before *the commencement of the action.*"
In the case befors me, it is seven years before the levy shall have
been made. Upon the authority of these cases, I do not hesitate
to adopt the like construction for the Act of 1822, and to declare
it susceptible of it in consistency with the rules of construction.

Lastly, the 4th section of the Act of 1822 cannot be considered
as declaratory, but as introducing a new rule of law. Lord *Coke*
considers the preamble as a key to open the understanding of the
statute. But the learned Chancellor *Kent*, in his commentaries,
(1 vol. 460–1, 3d edit.) says, they are generally loosely and care-
lessly inserted, and are not safe expositors of the law, and referring
to Mr. *Barrington's* observations on the statutes p. 300, shews,
by many instances, that a statute frequently recites that which was
not the real occasion of the law, or states, that doubt exists as to
the law, when, in fact, none had existed. It is true that the pre-
amble of this Act recites "a contrariety of decisions having taken

place in the different circuits in this State, as to the time when the property of the party against whom a judgment entered, shall be bound," &c. But the first and second sections of the enacting part of the Act points out in relation to what this contrariety of decision had occurred. It is where appeals were entered from the first verdict, and where different judgments were signed on verdicts rendered at the same time. Apart from these, there could have been no contrariety of decision upon that part of the 26th section of the Judiciary Act, which gives a lien from the signing of the first judgment upon all the property of defendant; nor upon any of the previous Acts upon this subject. And the 1st section of the Act of 1822, re-enacting *verbatim* and without explanation so much of the said 26th Sec. Act of 1799, proves it.

A declaratory law is to remove some doubt which previously existed with regard to the law. But no doubt ever did exist, that all the property of the defendant in execution was bound from signing the first judgment, or under the Act of '97, the first verdict, and that such lien was unlimited in duration, unless lost or displaced by some act of the party holding it. It was equally certain and well established, that constructive notice from the record was sufficient notice of such lien to subsequent alienees, judgment creditors and mortgagees. The Act of 1822, therefore, is not explanatory in this Sect. but introduces a new rule of law, by limiting the enforcement of the judgment and by requiring *actual* notice in the place of constructive. Suppose this levy to have been made immediately upon the passage of the Act, upon the construction asked for, we would calculate the seven years back. Could that possession bar the levy? No, because during all that time, constructive notice was sufficient. But you insist the statute requires *actual* notice. Is it not perceived that you require what was impossible to be performed before the passage of the Act in obedience to its provisions? that an entirely new rule is introduced, and consequently, this Act must be viewed as any other

PART II.—R. 2.

Act introducing a new law. When the argument of this motion took place, I apprehended that the construction contended for might be maintained, by considering this as a declaratory Act. I was momentarily misled by the preamble. I am satisfied it cannot be so received.

2. Whether a claimant in a claim case under the statutes of Georgia of 1799 and 1821 can protect himself or defeat the plaintiff's right to levy and sell by resorting to an outstanding title in a third person, not a party to the issue, and with whom he claims no privity.

What is the issue in a claim case ? The statute prescribes, " that where any sheriff shall levy an execution on property claimed by any person not a party to such execution, such person shall make oath to such property, and it shall be the duty of the sheriff to postpone the sale &c., till the next term of the court from whence the execution issued, and such court shall cause the right of property to be decided on by a jury, &c." The first step, therefore, necessary in interposing a claim is an affidavit asserting the property to be in the claimant. Now the object of pleading is to bring the alternate allegations of the parties to some specific point or matter affirmed on the one side and denied on the other. This result being attained, the parties are at the end of their pleading, and the question thus evoked for adjudication, is the issue. (*Stephen on Pleading*, 30.) Here the claimant comes in, and swears that the property is his. We have therefore a fact affirmed on the one hand. It is denied on the other that the property does belong to the claimant. The claimant holds the affirmative, the plaintiff in execution the negative of the issue. It is true the form of the verdict as adopted in our practice is, " We find the property subject or not subject to the execution." And it is also true that the plaintiff in execution is required to give *prima facie* evidence of property in the defendant in execution in the first instance. But this cannot change the state of the pleadings, or alter the question

submitted by them. How this form of verdict got into practice, I know not, and its propriety, in strictness, might perhaps admit of a question. The claimant was no party to the execution, and he makes himself a party to the proceeding by affirming a distinct fact. As soon as the plaintiff has given *prima facie* evidence of title in the defendant, the burden of proof is shifted, and the claimant is required to prove what he has affirmed, that is, to make out his own title. It is true also, the Act says, "shall cause the *right of property* to be decided on;" but this must also be understood to be in subordination to the issue. What right of property? That, I answer, involved in the question submitted by the pleadings. The issue being thus understood, it may be permitted me to remark, for the purpose of illustration, that formerly, when the Jury consisted of persons who were witnesses in the case, and taken from the vicinage, the issue was distinctly stated in the *venire facias*, that the Sheriff might be enabled to summon persons acquainted with the facts. Now the parties being required to prove their case before the Jury, must provide themselves with the necessary documents and witnesses; and hence the absolute necessity that they, like the Sheriff formerly, should be apprised of the specific question to be tried. The plaintiff comes in this case, prepared to dispute the title of the claimant to this property: unexpectedly and by surprise, he is required to litigate the title of a third person between whom and the claimant there is no privity.

This case has been supposed obnoxious to the rule which governs in England, viz. that although the plaintiff has a possessory title, which is better than that of the defendant, yet if the defendant can show a superior title in a third person, with whom he claims no privity, the plaintiff cannot recover. This rule has perhaps been too long considered as settled with us now to be questioned, even if this were a proper case in which to do so. A collection of authorities may however be found in a note in 3 *Wheat.* 224, in which the adjudications are not supposed to sustain the doctrine to this extent. Possession may constitute a good title,

and the tenant may stand upon his mere naked possession till a better title be shewn. And as the plaintiff must shew a subsisting possessory title, the defendant may shew that the title under which the plaintiff seeks to recover, has been conveyed away to a third person. Thus far the propriety of the rule in ejectment is well supported. Without intending to disturb the rule in ejectment, as I believe it to have been understood here, I cannot acquiesce in its applicability to the présent case. The proceeding by claim was given in the place of the remedy by action for damages, against the officer selling the property of a third person. None but the owner of the property could be endamaged by its sale, and he only could support his action. The claim law only designed to give him another remedy against the same injury. It never contemplated that under a claim interposed, the claimant might protect the property of any other person. In ejectment an outstanding title, that will protect the defendant, must be a present, subsisting and living title, and available. But the law requires the claimant to make oath that the property is his. With what consistency can he show title subsisting at the time in another? There seems to be an obvious repugnancy.

The law requires the claimant to give bond conditioned to pay the plaintiff all damages which the Jury, on the trial of the right of property, may assess against him, in case it should appear that such claim was made for the purpose of delay. To permit a claimant to protect the rights of all the world under his claim, it strikes me, would be going very far to evade this salutary provision of the law. What benefit to him, or what interest has he in the titles of others? What motive for interposing his claim? When the motive was solely delay, he could escape from its consequence. The plaintiff would necessarily be delayed, because after disposing of the claim, the true owner asserting title in himself, might immediately interpose another claim, and the previous trial could not bar his right, because he was neither a party nor privy to it.

[Robert Forsyth vs. Horatio Marbury.]

I am consequently of opinion that upon both grounds made in the motion, viz : The applicability of the Act of 1822 to this case, and the admissibility and effect of the evidence of title in a third person, the plaintiff in execution is entitled to a *new trial*.

It will be perceived that I have considered this case upon the assumption that the execution under which this levy was made, issued upon a regular judgment. In the manner in which the case has come before me I have been bound so to consider it, and indeed I have felt constrained in deciding this motion, to confine myself to the two points made by it, and insisted on in the argument of the plaintiff's counsel. The principle advanced on the part of the claimant that a new trial will not be granted, although there may have been error, if it is believed substantial justice has been done by the verdict, is recognized. But no statement of the evidence in the case, as agreed on by the parties, has been furnished me ; no notes of the Judge who presided at the trial, and I am left to infer the testimony from the *ex parte* statement, or occasional reference of counsel to it in the course of the argument. The legal conclusions which I am required to draw, upon the grounds taken in the argument for the claimant, upon the merits of the case, are so dependent upon the facts of the case, upon the evidence in the case, that I am totally unable, without a full view of that evidence, to decide upon the consistency of the verdict with the justice of the case.

The motion for *new trial* is *granted*.