GAJARSA, Circuit Judge,
with whom MICHEL, Chief Judge, and DYK, Circuit Judge, join, dissenting from denial of petition for rehearing en banc.
For the reasons stated below, I respectfully dissent from the court’s decision to deny the United States’ petition for rehearing en banc. This denial implicates fundamental questions regarding takings law. The panel majority’s opinion suggests that a government action can be construed to be a physical taking even if *1334 no physical proprietary interest has actually been taken by the United States. This is contrary to present Supreme Court law and contrary to our case law. Accepting this analysis of the panel majority eliminates the fíne distinction and balance that has been established by the Supreme Court between physical and regulatory takings. Moreover, it eliminates the ability of the legislature to provide for limited and parsimonious legislation protecting endangered species.
Supreme Court holdings are clear: in order to have a physical taking, there must be an appropriative use made of any such property. Eastern Enters. v. Apfel, 524 U.S. 498, 523, 118 S.Ct. 2131, 141 L.Ed.2d 451 (1998) (citing Calder v. Bull, 3 U.S. 386, 3 Dall. 386, 388, 1 L.Ed. 648 (1798) (“ ‘It is against all reason and justice’ to presume that the legislature has been entrusted with the power to enact ‘a law that takes property from A. and gives it to B.’”)). Conversely, if property is merely restricted in use by a regulation, that is the essence of a regulatory taking. Cf. Loretto v. Teleprompter Manhattan CATV Corp., 458 U.S. 419, 436, 102 S.Ct. 3164, 73 L.Ed.2d 868 (1982) (distinguishing the physical invasion in that case as “qualitatively more severe than a regulation of the use of property, even a regulation that imposes affirmative duties on the owner, since the owner may have no control over the timing, extent, or nature of the invasion”).
Assuming that Casitas does have a property right in the water it is permitted to divert from the Ventura River above the Robles dam, cf. Amicus Curiae Br. of Cal. St. Water Resources Control Bd. at 6, 7-8 (identifying and explaining limitations on water rights under California law), the parties agree that this right is only a right to divert water.[1] Thus, to the extent that the government has limited Casitas’ property, this limitation can by definition amount to no more than a burden on Casitas’ usufructuary right to divert water.[2] Despite Loretta's recognition that regulations on the use of property, even those imposing affirmative obligations on property owners, do not constitute physical takings, the panel majority reached a novel conclusion — a requirement under the Endangered Species Act to leave in a river a minimum amount of water that is not itself privately owned must be analyzed as a physical taking of a party’s use of that water. Cf. Nollan v. Cal. Coastal Comm’n, 483 U.S. 825, 831-34, 107 S.Ct. 3141, 97 L.Ed.2d 677 (1987) (analyzing a land use permit conditioned on the grant of a public easement as a regulatory taking, even though outright acquisition of the easement by the government would constitute a physical taking).[3] The panel majori *1335 ty’s legal conclusion impairs and frustrates the logic applied by the Supreme Court.
Even if Casitas owned the water outright, there would be no basis for the panel majority’s decision. The legal premise for this case should begin with Penn Central’s recognition that regulatory takings analysis applies to a government “interference aris[ing] from some public program adjusting the benefits and burdens of economic life to promote the common good,” Penn Cent. Transp. Co. v. New York City, 438 U.S. 104, 124, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978), and conclude with Tahoe-Sierra, where the Court based its analysis on the “longstanding distinction between acquisitions of property for public use, on the one hand, and regulations prohibiting private uses, on the other,” Tahoe-Sierra Pres. Council v. Tahoe Reg’l Planning Agency, 535 U.S. 302, 323, 122 S.Ct. 1465, 152 L.Ed.2d 517 (2002). See also id. at 324 n. 18, 122 S.Ct. 1465 (distinguishing “ ‘actual taking of possession and control’ of a coal mine” analyzed as a physical taking, United States v. Pewee Coal Co., 341 U.S. 114, 116, 71 S.Ct. 670, 95 L.Ed. 809 (1951), from issuance of “a wartime order requiring nonessential gold mines to cease operations” analyzed as a regulatory taking, United States v. Central Eureka Mining Co., 357 U.S. 155, 168, 78 S.Ct. 1097, 2 L.Ed.2d 1228 (1958)).
Such an approach would be consistent with Supreme Court precedent stretching back to Pennsylvania Coal v. Mahon, 260 U.S. 393, 415, 43 S.Ct. 158, 67 L.Ed. 322 (1922). In Mahon, a statute required coal companies to leave in place a pillar of coal to prop up the surface land above coal mines owned by third parties. The statute destroyed the coal companies’ right to mine the coal contained in the pillars— characterized by the court as “very nearly the same effect for constitutional purposes as appropriating or destroying [the right],” id. at 414-15, 43 S.Ct. 158 — in favor of the public’s interest in preserving the surface land above the coal mines. The Supreme Court treated the question as involving a regulatory taking, not a physical taking: “The general rule at least is that while property may be regulated to a certain extent, if regulation goes too far it will be recognized as a taking.” Id. at 415, 43 S.Ct. 158. The Court went on to explain that the question was one “of degree,” not capable of being “disposed of by general propositions.” Id. at 416, 43 S.Ct. 158. The particular regulation was held to constitute a taking.
In shaping the factors that go into a regulatory taking, the Supreme Court expressly relied on Mahon in Penn Central. There, the Court characterized Mahon as “the leading case for the proposition that a state statute that substantially furthers important public policies may so frustrate distinct investment-backed expectations as to amount to a ‘taking.’” Penn Central, 438 U.S. at 127, 98 S.Ct. 2646. And in Tahoe-Sierra, the Court relied extensively on Mahon, which it characterized as the opinion that “gave birth to our regulatory takings jurisprudence.” 535 U.S. at 325, 122 S.Ct. 1465.
The panel majority offers no convincing reason for approaching this case differently from Mahon. Casitas alleged a property right to the consumptive use of the diverted water that is similar to the right the coal companies had to mine the pillars of coal that were propping up the surface land in Mahon. Both Casitas’ and the coal companies’ use rights were frustrated by governmental regulation. But in neither case did the government appropriate property or convey it to a third party. It is, therefore, inconsistent with precedent to treat the diversion of water in this case as a physical taking, given that the Supreme Court treated the limitation on coal use in Mahon as a regulatory taking.
*1336 The panel majority’s analysis here appears contrary as well to many of our own cases. We have consistently rejected landowners’ claims that species preservation regulations effect a temporary physical taking because a portion of their property is exclusively occupied, at least for a period of time, by an endangered species. For example, we have treated a requirement that a landowner not cut and utilize trees that are used for owl nesting as a regulatory taking. Boise Cascade Corp. v. United States, 296 F.3d 1339, 1354 (Fed.Cir.2002). We specifically noted in Seiber v. United States that “[t]he governmental protection of owls in Boise Cascade ... is not comparable to a governmental authorization to third parties to utilize property.” 364 F.3d 1356, 1367 (Fed.Cir.2004). And we have treated the prohibition of surface mining as a potential regulatory taking. Stearns Co. v. United States, 396 F.3d 1354, 1358 (Fed.Cir.2005); see also Rith Energy, Inc. v. United States, 247 F.3d 1355, 1364 (Fed.Cir.2001). The panel majority’s opinion offers no reason for treating water differently than coal or trees or other property involved in regulatory takings cases.
Furthermore, the panel majority’s rationale premised on International Paper Co. v. United States, 282 U.S. 399, 51 S.Ct. 176, 75 L.Ed. 410 (1931), United States v. Gerlach Live Stock Co., 339 U.S. 725, 70 S.Ct. 955, 94 L.Ed. 1231 (1950), and Dugan v. Rank, 372 U.S. 609, 83 S.Ct. 999, 10 L.Ed.2d 15 (1963), does not support a physical taking analysis here, if those decisions are properly analyzed. In International Paper, all of the water previously used by the plaintiff to operate its paper mill was requisitioned for power generation. 282 U.S. at 405-06, 51 S.Ct. 176. In both Gerlach and Dugan, all of the seasonal flood waters in which landowners adjacent to the San Joaquin River had a riparian right of use for irrigation of their grasslands were diverted and sold to other property owners for irrigation. Gerlach, 339 U.S. at 729-30, 70 S.Ct. 955; Dugan, 372 U.S. at 613-14, 83 S.Ct. 999. These cases do not support the panel majority’s conclusion that this restriction on the use of Casitas’ property should be analyzed as a physical appropriation rather than a mere regulatory requirement that less of it be used. Cf. Mahon, 260 U.S. at 414-15, 43 S.Ct. 158; Keystone Bituminous Coal Ass’n v. DeBenedictis, 480 U.S. 470, 477, 488 n. 8, 107 S.Ct. 1232, 94 L.Ed.2d 472 (1987) (noting that a requirement to leave 50% of subsurface coal unmined “of course, involves land use regulation, not a physical appropriation of petitioners’ property”). Moreover, the Supreme Court has clearly proceeded and clarified the distinctions between and among physical and the various forms of regulatory takings in, for example, Penn Central, Loretto, Lucas v. South Carolina Coastal Council, 505 U.S. 1003, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992), Tahoe-Sierra, and Lingle v. Chevron U.S.A., Inc., 544 U.S. 528, 125 S.Ct. 2074, 161 L.Ed.2d 876 (2005).
The panel majority opinion fails to follow clear Supreme Court and Federal Circuit precedent. For these reasons, this court should have reconsidered the case en banc. Failing to do so, I dissent.

. The panel majority and en banc concurrence mistakenly characterize Casitas’ right to divert water — which the government conceded to be within the scope of Casitas’ property rights for purposes of summary judgment — as a possessory ownership right. Such a property right has not at any time been conceded and, indeed, could not be said to exist under California law.

. The parties agreed that Casitas has the right to divert 107,800 acre-feet of water from the river each year, but does not have any other rights with respect to that water. The diverted water is stored in Lake Casitas and evaporates or is released back into the river over the Lake Casitas dam; Casitas has an appro-priative right to actually use only 28,500 acre-feet of water per year. The parties also appear to agree that there has been no taking of the 28,500 acre-feet of water to which Casitas has an appropriative right.

.In the instant case, the requirements of the BiOp — that more water remain in the Ventura River and that Casitas build a fish ladder— were imposed as conditions for Casitas’ incidental take permit, under which it would not be liable for damage to the endangered steel-head.